WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fred R. Ruiz,<br><br>        Plaintiff,<br><br>v.<br><br>Albertson's Warehouse,<br><br>        Defendant.<br><br>Fred R. Ruiz,<br><br>        Plaintiff,<br><br>v.<br><br>Albertson's LLC,<br><br>        Defendant. | No. CV-15-01945-PHX-GMS (LEAD CASE)<br><br>**CONSOLIDATED WITH:**<br><br>No. CV-16-02923-PHX-GMS<br><br>**ORDER** |

    Pending before the Court are two motions by Defendants Albertson's LLC and Albertson's Warehouse (collectively, "Albertsons")[1]: a Motion for Summary Judgment, (Doc. 68), and a Motion to Dismiss Plaintiff's Second Complaint, (Doc. 70). For the reasons that follow, the Court grants both motions.

---

[1] Albertson's Warehouse is a wholly-owned subsidiary of Albertson's LLC.

**BACKGROUND**

## I. The Plaintiff and His Allegations

Plaintiff Fred R. Ruiz worked as a truck driver for Albertsons beginning in July 1993, first as a leased driver and then beginning in July 1994 as an employee of Albertsons. He is a United States citizen of Mexican descent. He has a prosthetic leg, having been involved in an accident in 1985 that resulted in the amputation of his left leg below the knee. He was terminated from his employment with Albertsons on September 5, 2012.

Ruiz alleges that he was terminated as a result of discrimination based on his national origin, as well as in retaliation for his participation in an investigation regarding racially-charged remarks allegedly made by Transportation Supervisor John Everill. He also alleges that he suffered from harassment based on his national origin while he was employed, and that Albertsons failed to reasonably accommodate his disability and discriminated against him on the basis of his disability. Albertsons contends that Ruiz was terminated as a result of his repeated failures to abide by certain regulations, and denies the allegations of harassment and failure to accommodate.

## II. Rules and Discipline for Albertsons Truck Drivers

Truck drivers at Albertsons must follow the Federal Motor Carrier Safety Regulations ("DOT Regulations") promulgated by the United States Department of Transportation ("DOT"). Relevant here are the DOT regulations limiting the amount of time drivers may spend on duty and driving without taking a break. During the time period relevant to this lawsuit, DOT regulations provided that drivers needed to take a ten-hour break after either eleven hours of driving time or fourteen hours of on-duty time. (Doc. 72 at 2.) DOT requires drivers to keep a log of their time to ensure compliance; Albertsons drivers use an electronic system known as a "Qualcomm" to keep track of their hours. Drivers at Albertsons's Tolleson Distribution Center, where Ruiz worked, begin their shifts with a 30-minute pre-trip inspection, which counts against their on-duty time.

Albertsons has a progressive discipline policy to deal with violations of DOT regulations and other rules applicable to drivers. (Doc. 72 at 3.) The basics of this policy are undisputed. There are four levels of discipline, starting at verbal counseling and progressing to written warnings, suspensions, and finally termination. (Doc. 72 at 3, Doc. 82 at 4.) The Orientation and Policy Manual for the Tolleson Distribution Center ("Handbook")[2] described how the progressive discipline policy worked for various violations. The Handbook emphasized that employment at Albertsons was at-will. (Doc. 72-3 at 71.) The Handbook also stated the following:

> When appropriate, the Company may follow a corrective action process, which may include verbal and written warnings, suspension, and/or termination of employment. More severe performance issues and policy violations will require accelerated discipline. The Company reserves the right to determine the appropriateness and level of counseling, or other corrective action for each situation, including immediate termination from employment.

(Doc. 72-3 at 58, Doc. 83-4 at 24.)

According to the evidence presented by Albertsons—specifically, the declaration and deposition of Transportation Manager Wayne Van Cleve and the deposition of Human Resources Manager Nathan Krug—during the time period relevant to this lawsuit, the progressive discipline policy for DOT violations had four tiers. (Doc. 72 at 3.) For a first violation, an offender would receive a verbal counseling. A similar offense within a year would merit a written warning; a similar offense within a year of the written warning would merit a suspension; and a similar offense within a year of the suspension would lead to termination. But if an offense was more than a year after a prior similar offense, or was a different type of offense than one for which discipline was given within the previous year, discipline would begin at a verbal counseling. Ruiz disputes this; he testified in his deposition to his belief that this "policy" was in reality

---

[2] Both parties attached certain excerpts of this Manual to their statements of fact. (Doc. 72-3 at 36–81, Doc. 83-4 at 2–24.)

- 3 -

only applied to him, and that it was always his understanding that termination would only occur for the fourth offense in a one-year period. (Doc. 82 at 5.)

Over the course of his employment, Ruiz received twenty-five verbal counselings, eight written warnings, and four three-day suspensions. (Doc. 72 at 3–4.) Nevertheless, Ruiz was characterized by several supervisors as a generally honest and good employee.

## III. Ruiz's Relationship with Transportation Supervisor John Everill

Ruiz apparently did not have a good relationship, however, with Transportation Supervisor John Everill. Ruiz believes that Everill had long been looking for reasons to get him in trouble. (Doc. 72-1 at 27–28.) Soon after Everill became a supervisor in 2006, he apparently "verbally beat [Ruiz] up over some situation," using "vulgar language." (Doc. 72-1 at 16–17.) Ruiz had heard rumors that Everill had made a racially-charged remark years before as a driver, and Ruiz believed that Everill had a similar racial animus against him. Ruiz also contends that Everill was hostile toward Ruiz because of Ruiz's disability. Ruiz recounts a particular incident that occurred sometime prior to 2010:

> Okay. He asked me, "Why does it take you so long to leave the warehouse in than less than a—a half hour? Why does it take you longer than that?
>
> And he had already been on me about this before. And I finally said to him, I said, "John, I don't know, John. Maybe it's because I have one leg and I have to walk 150 yards to the shop to get my truck every morning. Maybe that's it."
>
> And then he says to me, "Then what the hell are you doing working here?"
>
> And I says, "John, are you denying me my employment based on my disability?"
>
> He realized what he had said, turned around, and didn't say one more word and walked away from me.

(Doc. 72-1 at 8–9.) Ruiz recounts several other incidents where he felt that Everill was expressing hostility toward him, and believed that animus towards Ruiz's national origin and/or disability was the motivating force of the hostility. Ruiz does not dispute, however, that he cannot identify any comments made to him about his national origin

specifically. (Doc. 72 at 10, Doc. 82 at 21.) Nor does he present evidence of any disparaging remarks about his disability apart from the incident described above. (Doc. 72-1 at 32–36.)

Ruiz's difficulty in completing his pre-trip check out in a timely manner led to his request to park his truck closer to the dispatch office, so that he would have a shorter distance to walk. He made this request to Wayne Van Cleve twice; once in late 2010 and once in early 2011.[3] Van Cleve denied Ruiz's request, telling him that there was not enough room to put another truck there, since both the Driver of the Year's truck and a specially-outfitted truck were parked there. Van Cleve did, however, allow Ruiz to have an extra fifteen minutes to do his pre-trip inspection. Ruiz was not satisfied with this accommodation, since it cut into his fourteen hours of on-duty time, but he never made his displeasure known. At any rate, in his six or more years on the Tolleson-El Paso run, Ruiz only had trouble finishing within the allotted fourteen hours four or five times.

Around the same time, in January 2011, an African-American truck driver named Melvin Dees complained about a racially hostile work environment in the warehouse, complaining specifically about John Everill. That led to an investigation conducted by an outside attorney. The outside attorney interviewed sixteen Albertsons employees, including Ruiz, during the investigation. Ruiz recalls telling her that Everill discriminated against him on the basis of his disability and his national origin, but only recalls telling her specifically of the incident where Everill asked Ruiz "what the hell are you doing working here?" (Doc. 81-23 at 2–3.) Ultimately, however, the attorney was unable to substantiate the allegations of discrimination against Everill. (Doc. 72 at 9–10.)

Ruiz believes that discipline against him was enforced with more vigor after his participation in the investigation. (Doc. 72-1 at 21.) At that point, a supervisor named Richard Lantz was in charge of write-ups, but Ruiz believes that Everill was working

---

[3] Ruiz stated in his response to interrogatories that the second request was made in January of 2012, rather than early 2011. (Doc. 81-22 at 14.) He clarified in his deposition, however, that this was a mistake, and that "[t]he 2010 and the 2011 dates are accurate." (Doc. 72-1 at 46.)

behind the scenes to ensure that Ruiz got disciplined. Ruiz admits, however, that he has no concrete evidence of this, though other employees do believe that Everill at least wanted Ruiz fired.

## IV. Four Disciplinary Incidents

On March 31, 2011, Ruiz received a Verbal Counseling for logging off his Qualcomm while he was working at a store, which is a violation of DOT regulations. On January 12, 2012, Ruiz received a Written Warning for a similar incident. On March 8, 2012, Ruiz received a Three-Day Suspension, again for logging off while working.

The final violation came on August 30, 2012. When Ruiz arrived at work, his Qualcomm indicated that he was already over his allotted hours. Ruiz spoke with Transportation Supervisor Mike Hein about this. Ruiz claims that Hein told him to drive anyway in hopes that the Qualcomm would "catch[] up with itself." (Doc. 72 at 4, Doc. 82 at 8.) Hein claims that Ruiz merely mentioned that the Qualcomm had an issue but that he had enough hours to drive. (Doc. 72 at 4, Doc. 82 at 8.)

Ruiz did drive, and the weekly Qualcomm report informed Van Cleve that Ruiz had driven without having the hours to do so. Van Cleve investigated, and after a consultation with Human Resources, fired Ruiz for this fourth violation of DOT regulations.

On September 29, 2015, Ruiz filed suit in this Court as a pro se litigant, alleging violations of Title VII and the ADA. (Doc. 1.) He listed three claims, touching on five distinct causes of action: (1) National Origin Discrimination and Harassment under Title VII; (2) Retaliation under Title VII; and (3) Failure to Accommodate and Disparate Treatment under the ADA. (Doc. 1 at 17–20.) Subsequently, Ruiz retained counsel, and his attorney filed a notice of appearance in this Court on March 1, 2016. Nearly five months later, on July 18, 2016, Ruiz filed a motion to amend/correct his Complaint so as to add two claims under 42 U.S.C. § 1981, in addition to certain other modifications. (Doc. 45.) After briefing by both parties, this Court denied that motion as failing to demonstrate diligence and good cause. (Doc. 56.) Twelve days later, Ruiz filed another

complaint, which was assigned to a different judge in this district. Complaint & Demand for Jury Trial, *Ruiz v. Albertson's, LLC*, CV-16-02923-PHX-DJH (D. Ariz. Aug. 31, 2016), ECF No. 1. Ruiz stated in that filing that he intended immediately to consolidate the two actions:

> These parties are the same as in another pending action in this Court, case #2:15 CV 1945 PHX GMS, which has not been resolved or adjudicated. The facts in both cases overlap, but the other action does not include claims brought under 42 U.S.C. 1981, whereas the instant case includes only 42 U.S.C. 1981 claims. To avoid duplication of efforts by all, the Plaintiff will move (or stipulate) to consolidate the instant case with the other pending action pursuant to FRCP Rule 42(a) so that both are before Hon. G. Murray Snow. The other action was filed by the Plaintiff before he had legal counsel and when he had no knowledge that 42 U.S.C. 1981 was also be [sic] a basis for relief.

*Id.* at 2. Accordingly, two weeks later, Ruiz moved to consolidate the cases, (Doc. 63), and that motion was granted, (Doc. 65).

Albertsons moved for summary judgment on Ruiz's claims in his original Complaint, (Doc. 68), and to dismiss the second, consolidated Complaint, (Doc. 70).

**DISCUSSION**

**I.     Motion to Dismiss**

The Ninth Circuit has addressed a situation where a plaintiff filed a complaint "in an attempt to avoid the consequences of her own delay and to circumvent the district court's denial of her untimely motion for leave to amend her first complaint." *Adams v. Cal. Dep't of Health Servs.*, 487 F.3d 684, 688 (9th Cir. 2007), *overruled on other grounds by Taylor v. Sturgell*, 533 U.S. 880 (2008). The Ninth Circuit recognized that simply because "plaintiff was denied leave to amend does not give [him] the right to file a second lawsuit based on the same facts." *Id.* (quoting *Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp.*, 296 F.3d 982, 989 (10th Cir. 2002)).

A district court is within its discretion to dismiss with prejudice a second complaint if the second complaint is duplicative of the first. *Id.* at 692. To determine whether the second lawsuit is duplicative, courts "borrow from the test for claim

preclusion" and "examine whether the causes of action and relief sought, as well as the parties or privies to the action, are the same." *Id.* at 689.

The parties do not dispute that the causes of action and parties or privies to the action are the same. (Doc. 70 at 3; Doc. 77 at 2.) There is no dispute that the claims Ruiz seeks to add "are related to the same set of facts and . . . could conveniently be tried together." *Western Sys., Inc. v. Ulloa*, 958 F.2d 864, 871 (9th Cir. 1992). There is no dispute that "the claims in both complaints relate to the same set of facts and form a convenient trial unit because they 'disclose[] a cohesive narrative'" of Ruiz's grievances against Albertsons. *Adams*, 487 F.3d at 690.

The Court is therefore within its discretion to dismiss the second complaint with prejudice, and that course is appropriate here. Ruiz presents no arguments for considering his additional claims beyond those which the Court already considered and denied in his motion for leave to amend. Further, as Plaintiff concedes, a grant of summary judgment on Ruiz's Title VII claims "would necessarily dismiss Ruiz's 1981 claims as well." (Doc. 77 at 6.) As the Court also grants Albertsons' motion for summary judgment, the claims Ruiz seeks to add in his second complaint are foreclosed in any event.

**II.   Motion for Summary Judgment**

    **A.   Legal Standard**

The Court grants summary judgment when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court views the evidence "in a light most favorable to the non-moving party." *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). Although "[t]he evidence of [the non-moving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor," the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party cannot avoid summary

judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or other materials; or (B) showing that the materials cited do not establish the absence of presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248). Thus, the non-moving party must show that the genuine factual issues "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250).

**B.     Analysis**

**1.     National Origin Discrimination and Harassment**

To prevail on a claim of national origin discrimination under Title VII, a plaintiff must establish a prima facie case of discrimination. *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 640 (9th Cir. 2003). If the plaintiff establishes a prima facie case of discrimination, the defendant has the burden to "articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct." *Id.* "If the defendant provides such a reason, the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination." *Id.*

A plaintiff may make out a prima facie case either by providing direct evidence of discriminatory intent or by proceeding under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Vasquez*, 349 F.3d at 640 & n.5. The

parties do not address any direct evidence of discriminatory intent, and the Court therefore proceeds to the *McDonnell Douglas* factors. Under this framework, a plaintiff makes a prima facie showing of national origin discrimination by demonstrating that: (1) he belongs to a protected class, (2) his job performance was satisfactory, (3) he suffered an adverse employment action, and (4) other similarly-qualified employees outside of the protected class were treated more favorably. 411 U.S. at 802; *Vasquez*, 349 F.3d at 640 n.5.

There is no dispute that Ruiz satisfies the first and third *McDonnell Douglas* prongs. He is a member of a protected class as an Hispanic American,[4] and he suffered an adverse employment action by being fired. There is a genuine issue of material fact as to the second *McDonnell Douglas* prong; while there is no dispute that Ruiz had a lengthy disciplinary record, there is evidence that several supervisors considered him an "honest" and "good" employee regardless. (Doc. 81 at 2.) But viewing the evidence in the light most favorable to Ruiz, he fails to make out a prima facie case on the fourth *McDonnell Douglas* prong.

Ruiz presents evidence that a number of other drivers violated DOT regulations but were not fired. (Doc. 81 at 10–11.) But unlike any of the other drivers indicated by Ruiz, Ruiz was fired after he violated a DOT regulation within a year of having previously been suspended for a DOT violation, consistent with the progressive discipline policy testified to by Van Cleve and Krug. None of the other employees whose disciplinary records Ruiz presents were similarly situated as to their job performance. Most of the drivers Ruiz lists had only one or two violations. The two that Ruiz lists that had four total violations are instructive by comparison. Tom Melvin, a Caucasian driver, had four violations, but they occurred in 2001, 2002, 2006, and 2009, and as such were either verbal counselings or written warnings. (Doc. 81-8.) George Myers, an African-

---

[4] National origin refers not just to the country of one's birth, but also to the country of one's ancestors. *See, e.g.*, *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 673 (9th Cir. 1988).

- 10 -

American driver, received a verbal counseling in July 2001 for a DOT violation.[5] (Doc. 81-10 at 7.) Ten years later, in March 2011, he received another verbal counseling. (Doc. 81-10 at 9.) Within a year, he committed another violation of DOT regulations, and in accordance with the progressive discipline policy was given a written warning. (Doc. 81-10 at 8.) The next recorded violation was more than a year later, in February 2013. (Doc. 81-10 at 2.) Thus, viewing the evidence in the light most favorable to Ruiz, no other individuals were similarly situated and treated more favorably. There is simply no evidence that any employee violated DOT regulations as often as Ruiz and did not receive the same discipline.[6] His claim for national origin discrimination therefore fails.

Ruiz also alleges that he was subject to a hostile work environment on account of his national origin. To prevail on a claim of national origin harassment, a plaintiff must show "(1) that he was subjected to verbal or physical conduct because of his national origin; (2) 'that the conduct was unwelcome'; and (3) 'that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment.'" *Kang v. U. Lim America, Inc.*, 296 F.3d 810, 817 (9th Cir. 2002) (quoting *Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir. 1998)). "Generally, a plaintiff alleging racial or national origin harassment [will] present facts showing that he was subjected to racial epithets in the workplace." *Id.*

---

[5] Ruiz states in his statement of facts that this violation occurred in July of 2012, (Doc. 81 at 11), but this is a misreading of the dates on the citation. (Doc. 81-10 at 7.)

[6] The entirety of Ruiz's argument against summary judgment on his national origin discrimination claim, as set forth in his Response, is that "[t]here is evidence that Ruiz was subject to disparate treatment," followed by a citation to his statement of facts. (Doc. 84 at 7.) In the currently applicable section as in others, the statement of facts combines argument with misstatements of the record. Ruiz appears to argue that he was treated differently than others, because, he asserts, "Albertson's only terminated drivers on [sic] if they received four write ups for the same offense within one year" and that discipline "older than one year drops off and the drivers were told not to worry about it." (Doc. 81 at 10.) The first "fact" is attributed to HR Manager Nathan Krug, who actually said on multiple occasions that the level of discipline would increase if one previous violation was within a year of a new violation. (Doc. 81-28 at 19, 23.) The second comes from Ruiz's deposition and appears to be his own misconception. At any rate, "[c]onclusory statements without factual support are insufficient to defeat a motion for summary judgment." *Surrell v. Calif. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008).

Ruiz asserts in his Response that "[t]here is evidence of such discrimination" and cites to his statement of facts. The facts cited provide no such evidence. Ruiz enumerates a number of write-ups he received that he "considered" to be "harassment and retaliation" because they were "undeserved." (Doc. 81 at 3–5.) He also sets forth facts indicating that John Everill had made discriminatory comments about Eastern Indians and African-Americans. (Doc. 81 at 6.) There are further factual allegations that Everill wanted to see Ruiz fired and was verbally abusive toward him, though the specifics of this verbal abuse are not given.[7] (Doc. 81 at 6.) Finally, Ruiz alleges that Everill harassed Ruiz about his pre-trip inspections[8] and audited his logs more often than he audited other drivers' logs. (Doc. 81 at 7.)

Lacking from any of this, however, is any evidence that Ruiz "was subjected to verbal or physical conduct because of his national origin," let alone that any such conduct was "severe or pervasive." Ruiz does not dispute that he cannot identify a single comment ever made to him about his national origin. (Doc. 72 at 10, Doc. 82 at 21.) He merely says that "he could tell that Everill was discriminating against him by the way Everill treated Plaintiff." (Doc. 82 at 21.) But "[t]he working environment must both subjectively and objectively be perceived as abusive." *Fuller v. City of Oakland, Calif.*, 47 F.3d 1522, 1527 (9th Cir. 1995). Even in the light most favorable to Ruiz, there is no evidence that objectively indicates that Ruiz was subject to harassment based on his national origin. His claim alleging such harassment therefore fails.

/ / /

/ / /

/ / /

---

[7] Again, Ruiz's Statement of Facts misstates the record. He cites the deposition of Carole Gabbei to support the factual allegation that Everill "was especially hard on Ruiz," but Gabbei only testified that Everill "was hard on a lot of the drivers" and that "[a]t times he was" hard on Ruiz. (Doc. 81-26 at 13.)

[8] According to Ruiz's Statement of Facts, Everill did not harass Claude Thyben, a Caucasian driver, who would sit in his truck for an hour during his pre-trip inspection. (Doc. 81 at 7.) The portion of the record cited to, however, is simply a vague allusion by Ruiz to noticing an unnamed driver sitting in his truck for an hour. (Doc. 83 at 22.)

## 2. Retaliation

The Civil Rights Act of 1964 "prohibits retaliation against an employee 'because he has opposed any practice made an unlawful employment practice'" by Title VII. *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1078, 1082 (9th Cir. 1996) (quoting 42 U.S.C. § 2000e-3(a)). The elements of a Title VII retaliation claim are as follows: (1) the employee was engaged in a protected activity, (2) the employee was thereafter subjected by his employer to an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. *Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004). But an employer may defeat such a claim on summary judgment by presenting legitimate, non-retaliatory and non-pretextual reasons for the adverse employment actions. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).

Protected activity includes formal and informal complaints of activity that the employee reasonably believes violates Title VII. *See, e.g.*, *id.* at 1240 & n.3. By participating in the 2011 inquiry, and making complaints against John Everill, therefore, Ruiz engaged in protected activity. It is also undisputed that, twenty months after the inquiry, Ruiz was fired, and that this firing constitutes an adverse employment action. Ruiz further contends that each instance of discipline imposed against him after the inquiry also constitutes an adverse employment action. "[A]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." *Ray*, 217 F.3d at 1243. Assuming without deciding that the discipline imposed on Ruiz qualifies as an adverse employment action, Ruiz's claim still fails for lack of a causal link.

The "causal link" is a "but-for" causal link; in other words, the adverse employment action must have taken place as a result of the protected activity. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). It is undisputed that Ruiz violated DOT regulations, and that Albertsons has a progressive discipline policy dealing with violations of DOT regulations. It is also undisputed that Ruiz received numerous

- 13 -

disciplinary citations *prior* to participating in the inquiry. He therefore cannot demonstrate a but-for causal link between his participation in the inquiry and the write-ups he received after.

Even assuming Ruiz could make out a prima facie case, viewing the evidence in the light most favorable to Ruiz, Ruiz's repeated violations of DOT regulations serve as a non-retaliatory reason for the write-ups and eventual termination.

It is also undisputed that no other Albertsons employee received the number of write-ups in quick succession that Ruiz did, and that no other Albertsons employee was fired under the progressive discipline policy. Ruiz argues that this shows that he was retaliated against, but it actually shows the opposite: That none of the other employees who participated in the inquiry received similar levels of discipline or were terminated shows that Albertsons's reasons for taking action against Ruiz were not pretextual. *See Schiff v. City & Cty. of S.F.*, 528 F. App'x 758, 759–60 (9th Cir. 2013) (finding that a plaintiff had "not met his burden of demonstrating that the reasons proffered by the City [for not promoting him] were merely a pretext for a retaliatory motive" when "three others who engaged in the same protected activity as [the plaintiff] were promoted").

Ruiz's retaliation claim thus fails.

### 3. Failure to Accommodate and Disparate Treatment

Ruiz also alleges a failure to accommodate. This claim, however, is time-barred. To bring a failure to accommodate claim under the ADA, a plaintiff must file a charge of discrimination with the Equal Employment Opportunity Commission within either 180 or 300 days of the alleged failure to accommodate. 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a).

In his initial Complaint, Ruiz asserted that he "made two requests for a reasonable accommodation" and that the "first request was made in late 2010 and the second [in] early 2011." (Doc. 1 at 10.) He conceded that he had mistakenly reported to the EEOC that he had made a request in January 2012. (Doc. 1 at 10.) In response to an interrogatory, Ruiz repeated the January 2012 date. (Doc. 81-22 at 14.) However, he

clarified repeatedly in his deposition that any requests for accommodation were made close in time to each other, in late 2010 and early 2011:

> Q: . . . "Plaintiff's first request was made in late 2010, and the second in early 2011." Is that accurate?
>
> A: Yes. Uh-hum. I'm recalling that now.
>
> [. . .]
>
> Q: So you think in late 2010 is when you went to Wayne and asked to park by the office; is that correct?
>
> A: The first time, correct. Uh-huh.
>
> Q: And you said Wayne did not get back to you right away so you went back to him in a month?
>
> A: He says, "I'll get back to you," and he never did. And a month later I went back to him and I asked him, "Wayne, what did Dale Rich say about that—that accommodation?" Wayne told me, he says, "Not at this time, we're not going to let you park a truck there."
>
> [. . .]
>
> A: . . . I was denied my—the second time, which was early 2011. I was denied that time. Again, I went to Wayne and I says, "Wayne, John is—John is harassing me about my departure time, can I please park the truck up here with the other two?" . . . This time I let two weeks go by and he never got back with me. I finally went to him and he says, "No, we're not going to let you park the truck there, but we will allow you an extra 15 minutes to help you get out of here."
>
> [. . .]
>
> Q: And you never told Wayne that you had a problem with his suggestion of using an extra 15 minutes, correct?
>
> A: No. I never went back to him. The issue was not brought up again.
>
> [. . .]
>
> Q: Well, in your paragraph 36 of the—of the Complaint you said that you did make a mistake in your EEOC charge because you—and in your EEOC charge you listed January 2012—
>
> A: Uh-hum.
>
> Q: —and you said that was a mistake—
>
> A: Uh-hum.

> Q: —and that your actual requests were made in late 2010 and early 2011.
>
> [. . .]
>
> Q: So are those dates accurate?
>
> A: The 2010 and the 2011 dates are accurate.

(Doc. 72-1 at 39–46.) In his Response, Ruiz twice states that the final accommodation request occurred in January 2011, (Doc. 84 at 6, 9), and only states that it occurred in January 2012 in arguing that the request is not time-barred. (Doc. 84 at 8.) Regardless, in his sworn deposition, Ruiz stated that the 2012 date is incorrect, and he cannot create an issue of fact by simply contradicting his deposition testimony in part of his Response. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("[A] party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."); *Foster v. Arcata Assocs.*, 772 F.2d 1453, 1462 (9th Cir. 1985) ("[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."). With his requests for accommodation occurring in late 2010 and early 2011, Ruiz's filing with the EEOC in September 2012 was not timely filed and his failure to accommodate claim is accordingly time-barred.

The basis for Ruiz's disparate treatment ADA claim is not entirely clear from his Complaint or his Response to the pending summary judgment motion. Ruiz states in his Response that the request for accommodation "and Albertson's inaction thereafter are the basis for Ruiz's ADA claim[] of . . . disparate treatment." (Doc. 84 at 8.) He also appears to argue that the alleged failure to accommodate was based in discrimination against his national origin and in retaliation for his participation in the protective inquiry. (Doc. 84 at 8–9.) Nevertheless, as each of these theories depends on the alleged failure to accommodate, Ruiz's disparate treatment claim is also time-barred.

/ / /

## CONCLUSION

Plaintiff Fred Ruiz has failed to raise any genuine issues of material fact that entitle him to survive Albertsons's motion for summary judgment. Accordingly, summary judgment is granted for Albertsons on all of Ruiz's claims. Further, his second complaint, alleging violations of 42 U.S.C. § 1981, is dismissed.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment, (Doc. 68), is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss, (Doc. 70), is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to terminate this action and enter judgment accordingly.

Dated this 16th day of June, 2017.

_____
Honorable G. Murray Snow
United States District Judge